**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| THE MUHLER COMPANY, INC.,           )<br>                                                              )<br>                        Plaintiff,           )<br>                                                              )<br>           vs.                                            )<br>                                                              )<br>WINDOW WORLD OF N.                )<br>CHARLESTON LLC,                       )<br>                                                              )<br>                        Defendant.        )<br>_____)  | No. 2:11-cv-00851-DCN<br><br>**ORDER** |

This matter is before the court on plaintiff The Muhler Company, Inc.'s ("Muhler") motion for entry of judgment and for damages against defendant Window World of N. Charleston, LLC ("WWNC"). Based on the pleadings filed in this matter, as well as the uncontroverted evidence presented at the hearing, the court grants Muhler's motion for judgment and awards damages against WWNC as set forth herein.

## I.  BACKGROUND

The following facts are drawn from the proposed order emailed to chambers by Muhler and Muhler's motion for default judgment.

Muhler and WWNC are direct competitors in the business of supplying and installing replacement windows in Charleston County, South Carolina, and in neighboring coastal counties ("the market"). WWNC advertised through its website and other media that it adhered to the "strictest industry standards" in the conduct of its replacement window installation services. It advertised that it provided the "best for less" and that it was "lead certified." These representations were aimed at and reached consumers in the market. Similarly, Muhler advertised in the market that it "strives to

1

exceed customer expectations by offering the highest level of service and value," that it "complies with industry standards," and that it is a "certified lead renovator." Muhler expends great time, money, and effort to ensure that it meets the standards of its advertising and complies with industry standards when supplying and installing replacement windows.

WWNC's advertisements were false or misleading because, contrary to the literal meaning of its statements that it adhered "to the strictest industry standards," WWNC installed windows in Charleston County and neighboring areas without permits as required by law. WWNC also advertised that it was "lead certified." However, WWNC frequently neglected to notify homeowners of lead-based paint concerns, neglected to check or perform testing to determine if lead-based paint was present, or failed to perform lead remediation when installing replacement windows. These actions were done to secure a competitive advantage and were against public policy.

WWNC's failure to comply with the laws related to obtaining permits for replacement windows and failure to meet requirements with regard to lead-based paint allowed WWNC to gain an unfair competitive advantage in the market. WWNC was able to save significant money, time, and effort by failing to meet these requirements which allowed it to offer their products and services at a substantially lower price. This advantage then allowed WWNC to earn substantial revenues. It also had the effect of adversely impacting Muhler's business and its ability to compete in the market.

Muhler filed a complaint against WWNC in state court on March 11, 2011. WWNC removed the case to federal court on April 11, 2011. Muhler filed an amended complaint asserting three causes of action against WWNC: (1) false and misleading

advertising violation of the Lanham Act; (2) common law unfair competition; and (3) violation of the South Carolina Unfair Trade Practices Act ("SCUPTA").  WWNC initially appeared in the case through counsel and defended the allegations in this case.

On July 6, 2012, counsel for WWNC filed a motion to withdraw as counsel.  The court granted the request to be relieved and gave WWNC time to secure new counsel.  On August 6, 2012, new counsel briefly made an appearance on behalf of WWNC.  Shortly thereafter, the attorney filed a motion to withdraw as counsel, which the court granted on September 5, 2013.  The court's order allowed another thirty days for counsel to appear on behalf of WWNC.  No counsel made an appearance within that time.  As a result of the failure of WWNC to secure counsel, WWNC's answer was stricken and WWNC placed in default on January 15, 2013.

On October 10, 2013, Muhler filed the instant motion for judgment and damages.  The court held a damages hearing on November 12, 2013.  WWNC was notified of both Muhler's motion and the damages hearing.  Despite this notice, WWNC failed to appear at the hearing.  The motion is now ripe for the court's review.

## II.   STANDARDS

In determining whether to award a default judgment, the court will take as true the well-pleaded factual allegations in the complaint.  <u>Ryan v. Homecomings Fin. Network</u>, 253 F.3d 778, 780 (4th Cir. 2001) ("Defendant, by his default, admits the plaintiff's well-pleaded allegations of fact, is concluded on those facts by the judgment, and is barred from contesting on appeal the facts thus established." (quoting <u>Nishimatsu Constr. Co. v. Houston Nat'l Bank</u>, 515 F.2d 1200, 1206 (5th Cir. 1975))).  The court must, therefore, determine whether the well-pleaded allegations in the plaintiff's complaint support the

relief sought in this action. Id. "A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P. 54(c).

### III.  DISCUSSION

The court will first consider Muhler's claims to determine whether they support the relief sought in this action. The court will then determine the appropriate amount of monetary relief to which Muhler is entitled.

### A.  Findings of Fact and Conclusions of Law

The Lanham Act prohibits the "false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B). To bring a false advertising claim under § 1125(a)(1)(B), a plaintiff must establish that:

> (1) the defendant made a false or misleading description of fact or representation of fact in commercial advertisement about his own or another's product; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its product.

Scotts Co. v. United Indus. Corp., 315 F.3d 264, 272 (4th Cir. 2002).

SCUTPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C. Code Ann. § 39-5-20(a); see also Wright v. Craft, 640 S.E.2d 486 (S.C. Ct. App. 2006). To recover in an action brought pursuant to the SCUTPA, a plaintiff must establish the following three elements: (1) the defendant engaged in an unfair or deceptive act in the conduct of trade or

commerce; (2) the unfair or deceptive act affected public interest; and (3) a monetary or property loss as a result of the unfair or deceptive act(s). Id. "A trade practice is 'unfair' when it is offensive to public policy or when it is immoral, unethical, or oppressive; a practice is 'deceptive' when it has a tendency to deceive." Young v. Century Lincoln-Mercury, Inc., 396 S.E.2d 105, 108 (S.C. Ct. App. 1989) aff'd in part, rev'd in part on other grounds, 396 S.E.2d 105 (S.C. 1989). "Whether an act or practice is unfair or deceptive within the meaning of the UTPA depends on the surrounding facts and the impact of the transaction on the marketplace." Wright, 640 S.E.2d at 500. "An impact on the public interest may be shown if the acts or practices have the potential for repetition." Id. at 501 (internal citations omitted).

Muhler has established that WWNC was a licensee of Window World, Inc. Window World, Inc. is a national replacement window distributor. WWNC's website is linked to and accessed through the Window World, Inc. website. By following the instructions on the Window World, Inc. website, the customer is directed to use the "store locator to locate a Window World dealer near you." WWNC's website included its contact information as Window World, Inc.'s representative in the Southeast region of South Carolina, including Berkeley, Charleston, Colleton, and Dorchester Counties. Muhler conducts its business in these same areas. Thus, according to the evidence presented, Muhler and WWNC are direct competitors. Additionally, WWNC placed its advertising campaign in interstate commerce since it was published through the internet.

The court finds that WWNC's failure to obtain permits or meet lead-based paint requirements forecloses any possibility that it complied with the "strictest industry standards." Further, WWNC's representation that it is "lead certified" and

recommendation that consumers hire a "Window World certified professional" to check for lead-based paint because they are "certified risk assessors or inspectors, and can determine if your home has lead or lead hazards" implies that WWNC complies with all federal and state regulations associated replacing windows in homes with lead-based paint.  However, the court finds these representations were false and capable of deceiving consumers.  Muhler presented evidence showing that in over 1700 instances WWNC did not apply for or receive the required governmental permit for the installation.  Evidence also showed that WWNC often charged the homeowner for the required permit fee and kept the funds without applying for or obtaining the required permit.  Beginning in April 2010, federal law required that Muhler and WWNC, to the extent that their installations disturb lead-based paint in homes, businesses, and schools, be certified and follow specific work practices to prevent lead contamination.  These laws and regulations only apply to buildings which were constructed before 1978.  Evidence presented by Muhler showed that in at least 289 instances, WWNC neglected to notify homeowners of lead-based paint concerns, neglected to check or perform testing to determine if lead-based paint was present, or failed to perform lead remediation when installing replacement windows.

  WWNC's representations were material to consumers and likely to influence their purchasing decision.  The representations at issue had a tendency to deceive a substantial segment of its audience.  Furthermore, testimony presented at the hearing established that at least forty-four contracts procured by WWNC were likely diverted from Muhler's business.  Therefore, WWNC's actions diverted sales from Muhler.

WWNC made a false and misleading representation of fact in commercial advertisement about its own product. Based on the number of times it failed to apply for a permit or satisfy lead-based paint requirements, WWNC's conduct established an unfair business practice. Its conduct affected the public interest because it was capable of repetition. WWNC's misrepresentations were material to the purchaser's decision to purchase. In the context of this case, the statement that WWNC adheres to the highest industry standards and representations with regard to lead-based paint are false as no industry standard could allow WWNC to ignore governmental permitting requirements and lead-based paint requirements.

Based on the foregoing, the court finds that Muhler's well-pleaded allegations and the uncontroverted evidence of this case establish WWNC's violation of both the Lanham Act and the South Carolina Unfair Trade Practices Act.[1] Therefore, Muhler is entitled to monetary relief.

---

[1] WWNC is also liable under Muhler's cause of action for common law unfair trade practice, as that cause of action shares common elements with the Lanham Act. See Shakespeare Co. v. Silstar Corp. of Am., Inc., 802 F. Supp. 1386, 1399 (D.S.C. 1992) (noting that the elements of common law unfair competition under South Carolina law are identical to proving a Lanham Act Claim) rev'd on other grounds, 9 F.3d 1091 (4th Cir. 1993)

### B.     Monetary Relief[2]

Under the Lanham Act, a successful plaintiff may, "subject to the principles of equity, . . . recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). The court may, depending on the circumstances of the case, award damages up to three times actual damages. Id. However, the statute requires that any recovery of damages or profits in excess of actual damages must "constitute compensation and not a penalty." Id. "An enhancement is appropriate to compensate a Lanham Act plaintiff only for such adverse effects as can neither be dismissed as speculative nor precisely calculated . . . . Lost profits and market distortion are, however, appropriate bases for the catch-all enhancement contemplated by § 35(a)." ALPO Petfoods, Inc. v. Ralston Purina Co., 997 F.2d 949, 955 (D.C. Cir. 1993). "[T]he plaintiff's provable damages are the benchmark for determining whether an award constitutes compensation or whether it is a penalty." Badger Meter, Inc. v. Grinnell Corp., 13 F.3d 1145, 1157 (7th Cir. 1994). An enhancement of damages may be based on a finding of willful infringement, but cannot be punitive. Taco Cabana Int'l, Inc. v. Two Pesos, Inc., 932 F.2d 1113, 1127 (5th Cir. 1991), aff'd, 505 U.S. 763 (1992).

---

[2] It has been noted that "[t]here is a great deal of semantic confusion in [decisions] dealing with . . . monetary recovery for trademark infringement and unfair competition." 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 30.57 (4th ed. 2009). Courts have used "at least five ways of measuring monetary recovery." Id. Some courts refer to all forms of monetary relief as "damages," but Professor McCarthy believes that this "only serves to promote confusion" in an already confused area of the law. Id. Because Muhler seeks (1) actual damages, (2) WWNC's profits, (3) attorneys' fees, and (4) costs, the court will refer generally to "monetary relief" and will distinguish the types of relief as needed.

Acknowledging that the Lanham Act "gives little guidance on the equitable principles to be applied by a court in making an award of damages," the Fourth Circuit has identified six non-exclusive factors for courts to consider when making a damages award:

> (1) whether the defendant had the intent to confuse or deceive; (2) whether sales were diverted; (3) the adequacy of other remedies; (4) any unreasonable delay by the plaintiff in asserting his rights; (5) the public interest in making the misconduct unprofitable; and (6) whether it is a case of palming off.

Synergistic Int'l, LLC v. Korman, 470 F.3d 162, 174-75 (4th Cir. 2006).  The court will consider the six Synergistic factors before determining the amount Muhler is entitled to recover.

The first Synergistic factor – whether the defendant had the intent to confuse or deceive – "addresses whether there has been a willful infringement on the trademark rights of the plaintiff, or whether the defendant has acted in bad faith."  Synergistic, 470 F.3d at 175.  "[A] lack of willfulness or bad faith should weigh against an award of damages being made, but does not necessarily preclude such an award."  Synergistic, 470 F.3d at 175.  The evidence presented here – including more than 1700 installations for which WWNC failed to obtain a permit and at least 289 instances in which WWNC neglected to perform testing to determine if lead paint was present – makes it clear that WWNC willfully deceived consumers.

The second factor "involves the issue of whether the plaintiff lost sales as a result of the defendant's trademark infringement activities, and the extent to which the plaintiff had entered the market area where the infringement occurred."  Synergistic, 470 F.3d at 175.  Muhler has established that it competed in the same market as WWNC and that

WWNC's actions diverted window sales and installations from Muhler. The well-pleaded facts were supplemented at the hearing by the testimony of Muhler's controller, William Boyd. According to Boyd, Muhler lost contracts worth at least $159,520.30 during the applicable time period as a result of WWNC's misrepresentations.

The third factor "addresses whether another remedy, such as an injunction, might more appropriately correct any injury the plaintiff suffered from the defendant's infringement activities." Synergistic, 470 F.3d at 176. "If an injunction is an adequate remedy, this factor should weigh against a damages award." Id. Injunctive relief is insufficient to compensate Muhler for the profit it lost from sales and installations of replacement windows diverted by WWNC. Moreover, it is likely that Muhler was harmed monetarily to an even greater extent that can be affirmatively demonstrated. Although Muhler can only point to 44 contracts that they lost to WWNC, there are likely more consumers who chose WWNC over Muhler because of WWNC's unfair business practices.

The fourth factor "addresses the temporal issue of whether the plaintiff waited too long, after the infringement activities began, before seeking court relief." Synergistic, 470 F.3d at 176. "A substantial delay between the commencement of infringement activities and the plaintiff seeking judicial relief should weigh against an award of damages." Id. There is no evidence of any delay by Muhler in seeking relief. Upon learning of the acts complained of herein, Muhler sought counsel, who substantiated the factual underpinning of this litigation before ultimately filing suit.

The fifth factor – the public interest in making the misconduct unprofitable – "addresses the balance that a court should strike between a plaintiff's right to be

compensated for the defendant's trademark infringement activities, and the statutory right of the defendant to not be assessed a penalty." Synergistic, 470 F.3d at 176. WWNC's false advertising misled its consumers in such a way as to expose them to complete loss of value for the services they contracted to receive. These actions also violated public policy. However, the court remains mindful that any damages award "should constitute compensation and not a penalty." 15 U.S.C. § 1117(a).

The sixth and final factor – whether the situation involves a case of "palming off" – "involves the issue of whether the defendant used its infringement of the plaintiff's mark to sell its products, misrepresenting to the public that the defendant's products were really those of the plaintiff." Synergistic, 470 F.3d at 176. Palming off is not at issue in this case.

Based on a consideration of the Synergistic factors, the court finds that Muhler is entitled to a full recovery.

### 1. Actual Damages

Based on the evidence presented, the court finds that Muhler lost $159,520.30 in contracts because WWNC procured forty-four contracts with consumers for whom Muhler had sales leads. In an affidavit filed on April 2, 2014, Boyd testifies that Muhler's average profit margin on similar contracts is 52%. Boyd Aff. ¶ 6. This percentage accounts for costs associated directly with similar window replacement contracts and includes deductions for material, labor, permits, engineering, and inspection. Id. Therefore, the court finds that Muhler has suffered actual damages in the amount of $82,950.56.

Muhler argues that the court should treble these actual damages pursuant to § 1117(a). Based on the Synergistic factors discussed above, as well as likelihood that Muhler lost additional contracts beyond the forty-four identified, the court finds that WWNC's multiple failures, omissions, and misrepresentations warrant the trebling of damages. The court thereby awards Muhler $248,851.67 in actual damages.

### 2. Disgorgement of Profits

In proving disgorgement of profits under the Lanham Act, "the plaintiff shall be required to prove the defendant's sales only; the defendant then must prove all elements of cost or deduction claimed." 15 U.S.C. § 1117(a). Thus, the court considers WWNC's sales to be profit unless WWNC can prove "all elements of cost or deduction claimed." Id. In this case, WWNC was given notice of the hearing to determine damages but did not appear nor contest Muhler's damages claim. As a result, WWNC has offered no evidence of costs or challenged the revenue figures produced to this court.

At the hearing on damages, Muhler offered the testimony of expert report of Roy Strickland, a certified public accountant with the accounting firm Dixon Hughes Goodman. Strickland's opinion is that WWNC enjoyed gross revenue of $5,732,717.00 from the more than 1,700 jobs that were done without a permit. Based upon Strickland's conclusion, the court finds that Muhler has established to a reasonable degree of certainty that WWNC's gross revenues were $5,732,717.00. See Hospitality Int'l v. Mahtani, 1998 WL 35296447, at *11 (M.D.N.C. Aug. 3, 1998) ("Lanham Act damages may be awarded even when they are not susceptible to precise calculations; Where the wrong is of such a nature as to preclude exact ascertainment of the amount of damages, plaintiff may recover upon a showing of the extent of damages as a matter of just and reasonable

12

inference, although the result may be only an approximation." (quoting Ramada Inns, Inc. v. Gadsden Motel Co., 804 F.2d 1562, 1565 (11th Cir. 1986)).

After Muhler has satisfied its burden of proving WWNC's gross sales, the burden of proof shifts to WWNC "to prove all elements of costs or deductions claimed." 15 U.S.C. § 1117(a). First, WWNC must prove that the type of cost or deduction is allowed to be deducted from WWNC's sales under the Lanham Act. Hospitality Int'l, 1998 WL 35296447, at *22 (citing Maltina Corp. v. Cawy Bottling Co., 613 F.2d 582, 586-87 (2d Cir. 1980)). Second, WWNC must prove the amount of the allowable costs or deductions." Id. (citing 15 U.S.C. § 1117(a)). "Courts have repeatedly disallowed the deduction of costs which the defendant is unable to prove to be directly attributable to the sale of the infringing goods or services." Id. at 27. WWNC has failed to appear or defend this litigation. Despite being given time to secure new counsel and being provided notice of the damages hearing, WWNC has provided no evidence to establish any costs or deductions from gross revenues.

Muhler asks the court for disgorgement of WWNC's profits in the amount of $5,732,717.00. Such a recovery, which does not take into account WWNC's profit margin, would almost certainly penalize WWNC instead of compensating Muhler. Instead, the court assumes that WWNC's profit margin on window installations is similar to Muhler's. Using a 50% profit margin, WWNC's profit from the 1,700 jobs done without a permit would be $2,866,358.50. The court determines that that amount is a reasonable approximation of Muhler's lost profits because of WWNC's unlawful conduct. Therefore, Muhler is entitled to $2,866,358.50 of WWNC's profits, and such amount is "just, according to the circumstances of the case." 15 U.S.C. § 1117(a).

### 3. Attorneys' Fees

In "exceptional cases" involving violations of the Lanham Act, reasonable attorneys' fees may be recovered by the prevailing party. 15 U.S.C. § 1117(a). "Under 15 U.S.C. § 1117(a), a case is 'exceptional' if the defendant's conduct was malicious, fraudulent, willful or deliberate in nature." People for the Ethical Treatment of Animals v. Doughney, 263 F.3d 359, 370 (4th Cir. 2001) (internal quotations omitted). The Fourth Circuit has held that "for a prevailing plaintiff to succeed in a request for attorney fees, she must show that the defendant acted in bad faith." Scotch Whisky Ass'n v. Majestic Distilling Co., 958 F.2d 594, 599 (4th Cir. 1992). Once the court has determined that a case is "exceptional," the decision to award fees is a matter within the court's discretion. See Gentry Gallery, Inc. v. Berkline Corp., 134 F.3d 1473, 1480 (Fed. Cir. 1998); Vanwyk Textile Sys., B.V. v. Zimmer Mach. Am., Inc., 994 F. Supp. 350, 381 (W.D.N.C. 1997).

As discussed above, based on the evidence presented by Muhler – including more than 1700 installations for which WWNC failed to obtain a permit and at least 289 instances in which WWNC neglected to perform testing to determine if lead paint was present – the court finds that WWNC willfully and deliberately deceived consumers and undertook its actions in bad faith and, therefore, that this is an exceptional case warranting the imposition of attorneys' fees.

Having found that this is an exceptional case, the court must turn to the reasonableness of Muhler's request for attorneys' fees. Muhler has requested $127,348.00 in attorneys'' fees. In calculating an award of attorneys' fees, the court must determine the lodestar amount, defined as a "reasonable hourly rate multiplied by hours

reasonably expended." Grissom v. Mills Corp., 549 F.3d 313, 320-21 (4th Cir. 2008). To determine the reasonable number of hours and reasonable rate to use in calculating the lodestar, the court is guided by twelve non-exclusive factors, often known as the Barber factors:

> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

Grissom v. The Mills Corp., 549 F.3d 313, 321 (4th Cir. 2008) (quoting Spell v. McDaniel, 824 F.2d 1380, 1402 n.18 (4th Cir. 1987)). As the Fourth Circuit has noted, "the most critical factor in determining the reasonableness of a fee award is the degree of success obtained." Doe v. Chao, 435 F.3d 492, 506 (4th Cir. 2006) (quoting Farrar v. Hobby, 506 U.S. 103, 114 (1992)). Although courts should consider all of the Barber factors, they need not be strictly applied in every case inasmuch as all of the factors are not always applicable. See EEOC v. Serv. News, Co., 898 F.2d 958, 965 (4th Cir. 1990).

The court has considered all the Barber factors, and considers the following factors particularly applicable to the current case.

### a.     Time and Labor Expended

Counsel for Muhler spent over 1,100 hours litigating this matter. This includes handling the case, which has been pending for over three years, from pre-suit due diligence to trial preparation, even though the action eventually ended with a default

15

judgment. As indicated in the billing records for Muhler's counsel, discovery was extensive in this case. In particular, counsel spent a significant amount of time determining the scope and extent of WWNC's business practices. This required analyzing voluminous Freedom of Information Act responses from dozens of municipal and county officials in order to juxtapose those responses with WWNC's sales contracts over a three year period. Counsel also compared WWNC's sales contracts to determine which of those contracts Muhler had sales leads for. Additionally, there were a number of motions filed and WWNC made a number of objections to Muhler's discovery requests, both of which added to the time and labor required.

### b. Novelty and Difficulty of Questions/Skill Required

Another court in this district has noted that claims involving the Lanham Act and unfair competition "are generally recognized as complex areas of the law." Firehouse Rest. Grp., Inc. v. Scurmont LLC, No. 4:09-cv-00618, 2011 WL 4943889, at *14 (D.S.C. Oct. 17, 2011). Muhler pursued four causes of action that were governed by both federal and state law. These claims required Muhler to establish, among other things, that WWNC made a false or material misrepresentation of fact in in a commercial advertisement that has a tendency to deceive a substantial segment of its audience. Moreover, the scope of WWNC's business practices were not obvious at the outset of the case. As noted above, counsel for Muhler had to extensively investigate public records and WWNC's records, which added to the both the complexity of the case and the skill required to handle it.

### c.     Amount in Controversy and Amount Obtained

The amount in controversy here is high – Muhler sought over $5 million in damages in this case – and the court has awarded Muhler over $3 million in damages and disgorgement of profits.

### d.     Awards in Similar Cases

Given the complexity of the legal issues common to Lanham Act claims, attorneys' fees awards are often substantial, especially in cases that have gone to trial. See Firehouse Rest. Grp., 2011 WL 4943889, at *17 (awarding $241,888 in attorneys' fees following a jury trial); All Am. Title Loans, Inc. v. Title Cash of S. Carolina, Inc., No. 3:05-cv-1280, 2007 WL 1464580 (D.S.C. May 17, 2007) (awarding attorneys' fees of $150,869 following trial). Courts in this circuit have often awarded less for attorneys' fees when the case has resulted in a default judgment. See Herbert Richter Metallwaren-Apparatebau GmbH & Co., KG v. GIB Servs., LLC, 2011 WL 2516692 (E.D. Va. June 23, 2011) (awarding $13,309 in fees); Trailways Transp. Sys., Inc. v. Lion Corp., 2011 WL 2293883 (E.D. Va. June 9, 2011) (awarding $54,052.50 in fees). However, in both Herbert Richter and Trailways Transport, default judgment was entered very early in the case. In this case, default judgment was not entered until nearly two years after the suit was filed and shortly before the deadline for jury selection. Considering the late entry of default and the extensive discovery required by Muhler's counsel, the court does not considers Muhler's request for attorneys' fees to be consistent with awards in similar cases.

After careful consideration of the Barber factors, the court turns to the reasonableness of the hours spent working on the case. Muhler's counsel have provided

17

the court a detailed report of the hours they have billed for this case. The court has reviewed these billing records and finds that they are generally meticulous, fair, and reasonable. The court notes, however, that several of the legal assistants' time entries reflect tasks clerical in nature, such as creating notebooks or files and updating attorneys' calendars. Accordingly, the court will reduce the time entries submitted for the legal assistants by twenty-five percent to account for these clerical tasks. See Alexander S. v. Boyd, No. 3:90-cv-3062, 929 F.Supp. 925, 939 (D.S.C. 1995) (applying a percentage reduction for work performed by project assistants that was secretarial in nature); U.S. ex rel. Abbott-Burdick v. Univ. Med. Assocs., No. 2:96-cv-1676-12, 2002 WL 34236885, at *18 (D.S.C. May 23, 2002) (applying a percentage reduction for clerical work performed by paralegals and collecting cases).

The analysis turns next to the reasonableness of Muhler's counsel's hourly rates. In determining whether a rate is reasonable, the court is to consider "prevailing market rates in the relevant community." Rum Creek Coal Sales, Inc. v. Caperton, 31 F.3d 169, 175 (4th Cir. 1994) (quoting Blum v. Stenson, 465 U.S. 886, 895 (1984)). The relevant community for determining the prevailing market rate is generally the community in which the court where the action is prosecuted sits. Id. The Fourth Circuit has recognized that "[i]n addition to the attorney's own affidavits, the fee applicant must produce satisfactory specific evidence of the prevailing market rates in the relevant community for the type of work for which he seeks an award." Plyler v. Evatt, 902 F.2d 273, 277 (4th Cir. 1990) (citations and internal quotation marks omitted). Typically, a party seeking attorneys' fees would present an affidavit from a local counsel not connected to the present litigation who would offer testimony concerning prevailing local

18

rates for the relevant type of work. Robinson v. Equifax Info. Servs., LLC, 560 F.3d 235, 245 (4th Cir. 2009) (citing affidavits of other local lawyers as specific evidence "sufficient to verify the prevailing market rates").

According to D. Jay Davis, Jr., a partner at Young Clement Rivers, LLP, who represented Muhler in this matter, the hourly billing rates charged in litigating this case were: $220 per hour for partners and special counsel; $185 per hour for associates; and $40 per hour for paralegals.[3] Davis Aff. ¶ 5. Next, Muhler has presented the Court with an expert affidavit of attorney Wade H. Logan, III, a lawyer unconnected to this case who has practiced law in South Carolina for 43 years, which substantiates that the hourly rates charged by Muhler's counsel and staff are reasonable and commensurate with the prevailing market rates in Charleston for the type of work done. Logan Aff. ¶¶ 10-11. Based on the court's own knowledge of hourly rates in this district, the evidence submitted by Muhler, and billing rates in similar cases, the court finds that the hourly rates documented by Davis and reflected in the billing records are the prevailing market rates for this type of case in the District of South Carolina.

Based on the above, the court finds that the lodestar amount for Muhler's counsel is $118,600.00, which the court determines to be reasonable in this case. Therefore, the court awards $118,600.00 for attorneys' fees.

### 4.     Costs

A plaintiff that has established a violation of the Lanham Act "shall be entitled, . . . subject to the principles of equity, to recover . . . the costs of the action. 15 U.S.C. §

---

[3] Upon review of the billing records submitted to the court, it appears that the hourly billing rate charged for legal assistants was $80.

1117(a).  The award of "costs under the Lanham Act is committed to the sound discretion of the Court, based on the equities of each particular case."  PETA, 263 F.3d at 371 (citation omitted).  Muhler requests $9,768.96 in costs and has provided documentation for costs related to computer research, copying, long distance calls, and court fees.

This court joins several other courts in this circuit in disallowing recovery for the cost of computer research.  See Firehouse, 2011 WL 4943889, at *18 (collecting cases).  The court determines that the remaining costs are reasonable based on the equities of the case, and therefore awards Muhler $7,506.09 for costs.

## IV.   CONCLUSION

Based on the foregoing, the court **GRANTS** plaintiff's motion for default judgment and **AWARDS** Muhler monetary relief against Window World of North Charleston in the following amounts:  $248,851.67 for actual damages, $2,866,358.50 for disgorgement of profits, $118,600.00 for attorneys' fees, and $7,506.09 for costs.

**AND IT IS SO ORDERED**.

_____
**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**August 28, 2014**
**Charleston, South Carolina**